Mark A. Chavez (BAR #90858)
Nance Becker (BAR #99292)
CHAVEZ & GERTLER, LLP
42 Miller Avenue
Mill Valley, CA  94941
Phone:   (415) 381-5599
Fax:      (415) 381-5572
Email:   nance@chavezgertler.com

Jay Edelson (*pro hac vice*)
John Blim (*pro hac vice*)
Myles McGuire (*pro hac vice*)
BLIM & EDELSON, LLC
53 West Jackson Boulevard, Suite 1642
Chicago, IL  60604
Phone: (312) 913-9400
Fax: (312) 913-9401

John G. Jacobs (*pro hac vice*)
Bryan G. Kolton (*pro hac vice*)
THE JACOBS LAW FIRM, CHTD.
122 South Michigan Ave., Suite 1850
Chicago, IL 60603
Phone: (312) 427-4000
Fax: (312) 427-4000

Attorneys for PLAINTIFF
LACI SATTERFIELD

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACI SATTERFIELD, Individually, and on behalf of others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>SIMON & SCHUSTER, Inc., a New York Corporation, and IPSH!NET, Inc., a Delaware Corporation d/b/a IPSH!,<br><br>        Defendants. | Case No.: C06 2893 CW<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing:     June 7, 2007<br>Time:        2:00 p.m.<br>Place:       Courtroom 2, 4th Floor<br>Judge:       The Honorable Claudia Wilken<br>Trial Date: None Set |

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page(s)</u>

3

TABLE OF CONTENTS.................................................................................i

4

TABLE OF AUTHORITIES.........................................................................iii

5

INTRODUCTION ........................................................................................1

6

7
STATEMENT OF FACTS .............................................................................1

8
The "Cell" Advertising Campaign And The Cast
Of Characters:  Simon & Schuster, ipsh!, MIA, and mBlox....................1

9

10
The Technical Aspects Of Sending The Messages .................................3

11
Ms. Satterfield's Receipt of the Simon & Schuster Advertising Text Message ....................5

12
ARGUMENT ...............................................................................................6

13
I.    The Text Messages In Question Were Within The Purview of the
      TCPA – They Were Sent Via An "Automatic Telephone Dialing

14
      System" And Are "Calls" Under The TCPA................................................6

15
   A.   It Is Undisputed That The Technology Used By Defendants Had The
16
        Capacity To Store Telephone Numbers To Be Called And To Dial Such
        Numbers Without Human Intervention, Thus Constituting An ATDS ....................6

17

18
      1.    The Equipment Used By Defendants Had The Capacity To
            And Did, In Fact, Store Numbers To Be Called.................................7

19

20
      2.    The Equipment Used By Defendants Had The Capacity To And
             Did, In Fact, Automatically Dial Numbers Without Human Intervention .....9

21
   B.   The TCPA Prohibition Applies To These Text Messages ..........................12

22

23
II.   Defendants Are Not Entitled To Summary Judgment On
      The Basis Of Their Claim That Ms. Satterfield Was Not
      Charged For Their Unsolicited Text Call.................................................14

24

25
   A.   Defendants' Proposed Reading Of The Statute Is Untenable ......................14

26
   B.   Plaintiff Did Incur A Charge For Her Call...............................................17

27

28
PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

III. Ms. Satterfield Did Not Consent To Receive Defendants' Message Because
Simon & Schuster Is Neither A Nextones Affiliate Nor A Nextones Brand . ............18

A. There Is No Evidence Of Any Type Of Business Relationship
Between Simon & Schuster And Nextones ...................................................18

B. The Nextones Registration Form Is Legally Insufficient To Constitute
Consent To Receive Text Messages From Unrelated Third Parties ............19

C. Defendants' Argument Contradicts All Applicable Industry And Regulatory
Standards, Which Make Clear That The Sale And Resale Of A Customer
List Cannot Create An Affiliate Relationship ........................................................20

IV. Plaintiff Is Not Equitably Barred From Bringing This Action .....................................23

A. This Case Has Nothing To Do With The Rights Of Minors ..........................23

B. The Doctrine Of Unclean Hands Is Inapplicable Because Plaintiff
Seeks Statutory Penalties For Violation Of A Public Policy .........................24

C. Ms. Satterfield Did Not Engage In Inequitable Conduct ................................24

CONCLUSION .............................................................................................................25

CERTIFICATE OF SERVICE

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**

Page(s)

## Cases

*Azure v. Morton*, .
  514 F.2d 897 (9th Cir. 1975) ……………….……………………....................………..15

*Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists*,
  227 Cal.App.2d 675 (1964)………………………………………………...……..24

*Joffe v. Acacia Mortg. Corp*.,
  211 Ariz. 325, 121 P.3d 831 (Ariz.App. Div. 1 2005) ………………….…………....11, 13

*Jomicra, Inc. v. California Mobile Home Dealers Ass'n*,
  12 Cal.App.3d 396 (1970)………………………………...…………….…..……………..24

*Kaplan v. Ludwig*,
  2001 WL 1153093 (N.Y.A.D. Sep. 28, 2001)……………………………..……………….8, n.8

*Northwest Forest Resource Council v. Glickman*,
  82 F.3d 825 (9th Cir.1996) ………………………………………………..………..…………15

*United States v. Amer. Trucking Assoc*.,
  310 U.S. 534, 60 S.Ct. 1059 (1940) ………………………………………..………………13

*Waters v. San Dimas Ready Mix Concrete*,
  222 Cal.App.2d 380 (1963) …………………………………….…..…………………..24

## Statutes and Regulations

47 U.S.C § 227……………………………………………….…………….……1, 14-15, 20

64 C.F.R. §64.1200(d)(5) ……………………………………………...………………..21

*In the Matter of Rules and Regulations Implementing*
  *the Telephone Consumer Protection Act of 1991*,
  18 FCC Rcd 14014, 2003 WL 21517853 (F.C.C. July 3, 2003) …….…….…..7, 9, 17,12, 20-21

*In the Matter of Rules and Regulations Implementing the*
*Controlling the Assault of Non-Solicited Pornography and*
*Marketing Act of 2003; Rules and Regulations Implementing*
*the Telephone Consumer Protection Act of 1991*,
  19 FCC Rcd. 15927, 2004 WL 1794922 (F.C.C. August 12, 2004) …………………….…..12

**TABLE OF AUTHORITIES**

(cont.)

**Page(s)**

*In The Matter Of Rules And Regulations Implementing The*
*Telephone Consumer Protection Act Of 1991,*
   19 FCC Rcd. 19215, 2004 WL 2104233 (F.C.C. September 21, 2004) ………………………12

*In The Matter Of Rules And Regulations Implementing The*
*Telephone Consumer Protection Act Of 1991,*
   7 FCC Rcd. 8752 (1992) ………………………………………………………...……………...16


**Other Authorities**

Norman J. Singer, Sutherland on Statutory Construction § 47.33 (4th ed. 1985)………………15

*Notice of Proposed Rule Making in re Regulations*
  *Implementing the TCPA,*
   17 FCC Rcd. 17459, 2002 WL 31084939 (2002) …………………………...……………...8, 16

137 Cong. Rec. S18781-02, 1991 WL 252592 (Nov. 7 1991) ……….…….…..……………8, n.9

S.Rep. 102 177, 1991 WL 207560 (Oct. 8, 1991) …………………….……...…..…………….17

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

Defendants try mightily, but in vain, to escape the consequences of a textbook violation of the Telephone Consumer Protection Act, 47 U.S.C § 227 *et seq*. (the "TCPA") -- conducted on a massive scale -- in connection with an ill-advised attempted promotion of a Stephen King book entitled "Cell."

Defendants assert a variety of arguments to try to defeat Plaintiff's claim. They argue that no automatic telephone dialing system ("ATDS") was used here, exempting them from the reach of the TCPA. They likewise argue that a text message does not qualify as a "call" under the TCPA. Those arguments are at odds with the plain words of the statute, the express pronouncements of the FCC and the caselaw. These matters are addressed in Section I below. Defendants next argue that the TCPA requires that the party receiving the call must have been charged for it, and then argue that Plaintiff did not incur a charge in connection with their text message, and, therefore, no violation of the TCPA can be made out. This argument is wrong, both legally (the TCPA does not require a charge) and factually (Plaintiff did in fact incur charges in connection with the message). We address this argument in Section II below. Defendants next argue that Ms. Satterfield "expressly consented" to receipt of the message in question (a defense under the TCPA), and failing that, the final argument that Plaintiff's claim is barred by the doctrine of "unclean hands." As we discuss, the consent argument fails utterly, legally and factually. This is discussed in Section III below. Neither is unclean hands a defense that is available on these facts or under applicable law. This final defense argument is discussed in Section IV below.

An understanding of the facts material to the claim helps demonstrate the untenable nature of Defendants' motion. To those facts we now turn.

**STATEMENT OF FACTS**

**The "Cell" Advertising Campaign And The**
**Cast Of Characters:  Simon & Schuster, ipsh!, MIA, and mBlox**

In anticipation of the release of a new Stephen King novel called "Cell," publisher Simon

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

& Schuster made the decision to advertise the book with a cell-phone text messaging campaign. (SS 00231, 245-247, 255-256, attached to Kolton Dec. as Exhibit 1(A)); hereafter, unless specifically stated otherwise, all references to "Exhibit __" will mean an exhibit to the Kolton Declaration); see also (IPSH 000046-59, Exhibit 1(B)).  Simon, in turn, outsourced the project to defendant ipsh!, a mobile marketing firm in November of 2005.   (SS 000002-8, Exhibit 1(C))  In order to carry out Simon's request, ipsh! licensed a list of phone numbers from a third company, Mobile Information Access Corporation ("MIA").  (IPSH 000027-30, Exhibit 1(D); and IPSH 000020-26, Exhibit 1(E)).  Even though the advertising campaign was not supposed to launch until mid-January 2006, as early as November 2005,[1] ipsh!'s co-founder and now President, Michael Jelley was aware of a broad feeling within ipsh! that they should not be using MIA lists (Jelley 155:7-10, Exhibit 1(G)), and wrote an internal memorandum on December 20, 2005 expressing severe doubt about the legitimacy of the numbers provided by MIA:  "We had been reselling a list from MIA, but we are unable to offer this anymore as the quality of the opt-ins is suspect at best."  (IPSH 000481 Exhibit 1(H))  Jelley testified that by December of 2005, ipsh! had made the determination not to do business with MIA any more, but nonetheless determined to go ahead and use the numbers MIA provided for the Cell campaign.[2]  He testified that there was no reason ipsh! couldn't have acquired a new list from another source at that point, "it's just that this was the only vendor we had an agreement to obtain lists from."  (Jelley Dep. 76: 12-18.)

---

[1]   See also IPSH 000276 Exhibit 1(F) ("We are NOT using MIA at ALL anymore…Nihal was at the MMA convention and heard the ppl are considering MIA spam and because we use them…we are being considered spam…NOT GOOD.")(Emphasis in original); IPSH 000277 Exhibit 1(F) ("we've been identified as 'spammers' from carriers since MIA is NOT an MMA approved list."); IPSH  000281 Exhibit 1(F) ("MIA lists: no more please!").

[2]   Jelley testified that MIA had provided numbers from two sources, an online company called Zingy.com , and another online company called Exinde, Inc. d/b/a as Nextones.com  ("Nextones") (Jelley Dep. at 79:25-80:19). According to Jelley, Zingy used a method of acquiring "opt-ins" that he thought unacceptable; he understood that to be the reason that ipsh! used numbers from Nextones.com for use in the Cell campaign.  (Jelley Dep. 117:23-118:11) Jelley further testified that the quality of the opt-ins was less important than the profitability and effectiveness of the campaign.   (Jelley Dep. at 77:5-13)

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MIA provided ipsh! with an electronic plain text or Excel file containing 100,000 cellular telephone numbers. (Jelley Dep. 35:14-19) ipsh! then created a computer program[3] to assist in setting up and formatting the messages that were to be scheduled to be sent to the numbers obtained from MIA.  (*Id.* 56:10-21).  On January 17, 2006, ipsh! project manager Jennifer Sheridan scheduled the delivery of the 100,000 text messages at issue here. (*Id.* at 34:21-22 and 96:7-21)   An ipsh! programmer then imported those numbers into a database located on an ipsh! server set-up specifically for the Stephen King campaign (*Id.* at 55:9-56:21) and the numbers were stored on that database until they were to be "married" up with the advertising message and sent to the intended recipients. (*Id.* at 59:4-22)

ipsh! programmed the computers to send out the advertising text messages beginning after midnight (12:30 a.m.) on January 18, 2006. (Jelley Dep. 93:8-17)  However, according to Jelley, this was a mistake; in fact, they should have programmed the computers to begin sending out the messages after Noon that day (at 12:30 p.m.).  (Jelley Dep. 93:23-94:17)   Beginning that night, some 20,000 of the text messages began being sent at a rate of approximately 8,000 messages per hour – all without any human involvement – until the mistake was discovered. (Jelley Dep. 60:22-25 and 61:2-4)  Later that day, an additional 40,000 of the messages were sent.  (Jelley Dep. 67:12-24)   Later that day, however, one of the carriers (T-Mobile) and mBlox cut off ipsh!'s ability to transmit any further messages on the ground that they were spam. (Jelley Dep. 68:4-72:7). By this point, some 60,000 messages had been sent.  (Jelley Dep. 68:3-6*)*

**The Technical Aspects Of Sending The Messages**

In oversimplified terms, ipsh!'s computers were programmed to send the stored numbers and the text messages to yet a fourth company, mBlox, which company's computers, in turn, were able to figure out to which telephone carrier to send each set of data.   The individual sets of data were sent to the carriers, and, in turn, on each recipient's phone, the actual text message

---

[3]   The program allowed an ipsh! project manager to create and schedule bulk text message campaigns by filling in a series of fields -- including the date and time the text calls were supposed to be made and the body of the message -- on a form in a web browser of a desktop computer and submitting it to ipsh!'s server.  (Jelley Dep. at 96:7-16)

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    from Simon & Schuster would appear (although it did not identify Simon – or ipsh! -- as the

2    sender).

3         In more technical detail, the process was as follows. Once the messages were scheduled

4    to be transmitted, the program automatically took the phone numbers and the message and

5    married them up into an XML[4] formatted message (Jelley Dep. at 59:22-60:5). As ipsh!'s Jelley

6    explained, the numbers are placed into a message queue:

7         [T]here is [sic] two basic separate applications on our system that handles this
          process.  The one part takes the mobile number and the messages and the short
8         code that the message is going to be transmitted on and places a record for that
          information into a message queue on our system. The message queue then
9         processes those messages and builds the XML according to the API specification
          provided by mBlox.[5] (61:23-62:9)

10

11    ipsh!'s program then automatically transmitted that XML (containing the message recipient's

12   telephone number) over the internet via HTTP protocol to mBlox's server "one at a time" [6] in

13   sequence.  (*Id.* at 60:4-8 and 63:4-18)

14        Once the XML messages were transmitted to mBlox, mBlox would then transmit them to

15   the appropriate carriers. (Jelley Dep. 98:23-25).   As each XML message came in to mBlox, it

16   would take it and accept it; when the next one came in, mBlox would take it, and accept it, and

17   so on. (Emmet Dep. 54:9-19, Exhibit 1(I))  The messages (embedded with message recipient's

18   telephone number) arrived at mBlox as individual messages, in real-time, (*id.*) and came in the

19   order or sequence that they were sent, one after the other.  (*Id.* at 43:15-18) ("They are in the

20   order that IPSH sent them to me").

21   _____

22   4   XML is an extensible mark up language used to describe data with meta data so that computers and servers – and
     not humans – can communicate with each other. (*Id.* at 61:7-10)

23
     5   The data at this point before the message queue processes it is still not yet in a format that the mBlox server can
24   understand, so the central system takes those pieces of information and builds a piece of XML according to the API
     specification provided by mBlox.  (Jelley Dep. 63:4-13)

25
     6   Defendants' repeated  contention that the messages were sent "one at a time" when considered in the context of
26   the fact that they were sent at a rate of some 8,000 per hour, is not unlike saying that an AK-47 or an Uzi fires 650
     bullets a minute "one at a time."  In context, it is a meaningless phrase. The bullets are shot in blasts using automatic
27   weapons.   (See Jelley Dep. 68:8-10 and 81:12-16) (referring to large blast messages)

28                                               - 4 -

Using a collection of servers, computers, and software, mBlox then distributed the messages to the appropriate wireless carriers (*Id.* at 27:5-16), routing them via direct carrier connections, either through virtual private networks or T1 lines. (*Id.* at 32:5-11)  As mBlox's Emmet testified, the "phone number" embedded in the XML message was "the primary key used to route the SMS message." (*Id.* at 73:21-22) mBlox began processing and routing the messages as soon they arrived. (*Id.* at 54:17-21) *see also* (*Id.* at 29:15-18) (mBlox would "route it immediately regardless of time of day.").   The carriers accepted the messages from mBlox and immediately routed them from mBlox's entry point into the carrier networks directly to each customer's cell phone.  (Emmett Dep. 33:4-8)

### **Ms. Satterfield's Receipt of the Simon & Schuster Advertising Text Message**

Ms. Satterfield had two cell phones, one of which she let her minor son use. (Satterfield Dep. 15:15-23, Exhibit 1(J))  Shortly after 12:30 at night in the early morning hours of January 18, 2006, he came to his mother with the following message showing on the phone:  "[T]he next call you receive may be your last."   (Satterfield Dep. 12:3)  He was scared and she comforted him and told her she would take care of it.  (Satterfield Dep. 82:12-18) The entire message read:

> The next call you take may be your last... Join the Stephen King VIP
> Mobile Club at www.cellthebook.com. RplySTOP2OptOut. PwdByNexton.

(Jelley Dep. 100:12-24 and 101:4-7); see also (SS 000247, Exhibit 1(A)).  Ms. Satterfield texted the word STOP to the short code given in the message. (Satterfield Dep. 78:29-79:4).   She incurred a charge for sending the STOP message.  (CING 0029, Exhibit 1(K)). Under the plan she had with her cellphone carrier, her set monthly payment paid for, *inter alia*, receipt of an unlimited number of text messages, but not outgoing text messages; for those, she was billed on a per-message basis.  (LS 000001-5, Exhibit 1(L)).

It now appears that Ms. Satterfield and her son came to receive this unwanted text message because some fourteen months earlier, in December of 2004, at her son's request she had signed up for a free ringtone offered by a company called Exinde, Inc. d/b/a "Nextones." (Satterfield Dep. 48:25-49:18)  For security reasons, Ms. Satterfield had not entered complete

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

information as to her name or her son's onto the Nextones website, but had entered accurate information as to her phone number, zip code, and age range.  (Satterfield Dep. 50-54). The Nextones website represented that (1) its business was selling ringtones and other features to "customize" your phone, and (2) it would not sell customer information to third parties. (See Exhibits 1(N)-(R))   Additional facts are contained in the Argument section below.

## ARGUMENT

IV.   **The Text Messages In Question Were Within The Purview of the TCPA – They Were Sent Via An "Automatic Telephone Dialing System" And Are "Calls" Under The TCPA_____**

Defendants argue that only calls dialed by equipment that stores or produces numbers "using a random or sequential number generator" are covered by the TCPA and that at no point in the process of transmitting the text message to plaintiff were "random or sequential numbers involved in any way." (Mem. at 10: 8-9)   According to defendants, if a company loads a list of tens of thousands of cell phone numbers into a computer and has that computer send all those numbers an identical text message, it is perfectly fine because the computer didn't "randomly generate" the numbers.  That position is untenable.   We discuss it in sub-part A below.  Similarly, defendants argue that these text messages were not "calls" within the meaning of the statute.  This is discussed in sub-part B below.   In neither instance can Defendants' position be squared with either the plain words of the statute, the FCC regulations or the caselaw.

A.   **It Is Undisputed That The Technology Used By Defendants Had The Capacity To Store Telephone Numbers To Be Called And To Dial Such Numbers Without Human Intervention, Thus Constituting An ATDS**

As the attached Declaration of Randall A. Snyder (Exhibit 2) demonstrates, the equipment used by Defendants to promulgate these text messages plainly was an ATDS.  It had the capacity to store telephone numbers to be called and to dial such numbers without human intervention, automatically making calls to thousands of numbers in a short period of time.  According to Mr. Snyder any computer system, though particularly the hardware and software

used by Defendants here, could be programmed to perform these tasks.  We believe that the undisputed facts of record do not admit of any other conclusion; at a minimum, the evidence is sufficient to raise a triable issue and defeat Defendants' summary judgment motion on this claim.

**1. The Equipment Used By Defendants Had The Capacity To And Did, In Fact, Store Numbers To Be Called**

The statutory definition of an ATDS plainly contemplates equipment that has the capacity to either store **or** produce telephone numbers:

> The statutory definition contemplates autodialing equipment that <u>either</u> stores <u>or</u> produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "*capacity* to store or produce telephone numbers (emphasis added)...."

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd 14014, 14115, 2003 WL 21517853 (F.C.C. July 3, 2003) (the "2003 Report and Order") (Italics and ellipses in original) (underlining added)

The undisputed facts show that the equipment used by Defendants here had the capacity to and did, in fact, store telephone numbers.  As Mr. Jelley testified:

> Q.   Once you have imported the numbers into the database, what is done with it?
> A.   Nothing until the message is ready to be sent.
> Q.   Until the message is ready to be sent?
> A.   Yes.
> Q.   The message, is it inputted into any database?
> A.   It's <u>stored</u> in the same application, same database.
> Q.   Then what happens with the message and the list of numbers once you have inputted them both into your application?
>      MS. ARCHIE: Imported?
> Q.   Imported, I'm sorry?
> A.   <u>Nothing until the message is scheduled to be transmitted.</u>

(Jelley Dep. 59:4-22)  (emphasis added); see also *supra* at 5.

Defendants, however, try to seize on alternative language from the statute to suggest that in order to be an ATDS, the equipment must "randomly generate"[7] numbers, and if that was not

---

[7]   The language of the statute "using a random or sequential number generator" must be construed as modifying the last antecedent "produce telephone numbers" and not the word "to store," as it makes no sense to say that one could "store" numbers using a random or sequential number generator.

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

done, no violation can be found.  Defendants actually go so far as to argue that storing numbers and sending messages to those numbers is perfectly permissible and actually suggest that the FCC adopted that position.  Thus in footnote 6 of their memorandum, Defendants state, "The FCC has cited to an unreported case wherein use of a database was not considered an automatic telephone dialing system."  (Def. Mem. at 10:24.)

That phrasing by Defendants could give a <u>very</u> misleading impression without stating two additional facts:  (1) the FCC referred to that case when asking for comments on whether it should be a TCPA violation to use a database of numbers rather than randomly generated ones, and, after the comment period, concluded that this <u>was</u> prohibited; and (2) the very unreported trial court decision the FCC referred to as raising a question as to the propriety of using database lists in fact got <u>reversed</u>[8] and the plaintiff there in fact recovered for a violation of the TCPA.

Thus, the FCC recognized in 2002 that "in the last decade new technologies have emerged to assist telemarketers in dialing the telephone numbers of potential customers" (*Id.* at 17474) and invited *comment* on the definition of an ATDS and the evolving nature of ATDS technologies:

> The Commission seeks comment on the definition of "automatic telephone dialing system" (or "autodialer") and whether it is necessary to identify the technologies section 227 is designed to address.  *** We seek comment on this reading of the legislative history and whether Congress intended the definition of "automatic telephone dialing system" to be broad enough to include <u>any equipment that dials numbers automatically</u>, either by producing 10-digit telephone numbers arbitrarily <u>or generating them from a database of existing telephone numbers</u>.

*Notice of Proposed Rule Making in re Regulations Implementing the TCPA*, 17 FCC Rcd. 17459, 17473-74, ¶¶ 23-24, 2002 WL 31084939 (2002) ( "2002 TCPA Notice") (emphasis added).[9]

---

[8]  Thus, the unreported Town Court small claims court order of dismissal in *Kaplan v. Ludwig and Kustom Karpet Kleaners, Inc*., County of Wayne, New York (June 6, 2000) referred to by Defendants – which order was modified on appeal by order of the County Court to award plaintiff $50 – was subsequently <u>reversed</u> by the New York Supreme Court in *Kaplan v. Ludwig*, 2001 WL 1153093 (N.Y.A.D. Sep. 28, 2001), which held that Plaintiff <u>had</u> established a violation the TCPA and awarded him $550.  That case supports Plaintiff, not Defendants.

[9]  See also 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("[T]he FCC is not limited to considering existing technologies. The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies.").

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Most industry members that commented argued, as Defendants do here, that equipment that stores pre-programmed numbers or receive numbers from a computer database and then dials those numbers does not fall within the statutory definition of an ATDS since such numbers are not "randomly or sequentially" generated. 2003 Report and Order at 14090. Consumers and consumer groups took the position "that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference," arguing that for the recipient of the call, there is no difference whether the number is dialed at random or from a database of numbers. *(Id.* at 14090-91*)*

After receiving comments, the FCC issued its 2003 Report and Order which made clear that the ATDS requirement was to be interpreted <u>broadly</u> to apply to a wide spectrum of evolving technologies, including technology that is used to dial "lists" or "databases" of numbers, since such technology has the basic functional "capacity to <u>dial numbers without human intervention</u>":

> It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. <u>The basic function of such equipment</u>, however, <u>has not changed -- the capacity to dial numbers without human intervention</u>. We fully expect automated dialing technology to continue to develop.

2003 Report and Order at 14091-92. (emphasis added). The FCC concluded that "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on <u>autodialed calls</u> not be circumvented." *(Id.* at 14092-93*)* (emphasis added) According to the FCC, the legislative history suggests that "through the TCPA, Congress was attempting to alleviate a particular problem--an increasing number of <u>automated</u> and prerecorded calls to certain categories of numbers." *(Id*. at 14092) (emphasis added)

**2.     The Equipment Used By Defendants Had The Capacity To And Did, In Fact, Automatically Dial Numbers Without Human Intervention**

As explained above, Congress was clearly most concerned with the "automatic" or "automated" nature of such calls; the using of machines or computers to dial phone numbers with minimal human intervention.  It is uncontroverted that Defendants' equipment made the text calls automatically without human intervention.  Michael Jelley, the President of defendant ipsh!, testified that there was <u>no</u> human involvement in the transmission of the text messages:

> Q.   Is there any human involvement in that transmission?
>
> A.   No.

(Jelley Dep. 61:2-4) (*See, also,* 133:15-18)  Jay Emmet of mBlox confirmed the lack of "human interaction or intervention" in transmitting the messages:

> Q.   And still talking about the interaction between IPSH and mBlox to pass the messages off, is there any human interaction or intervention that takes place in that process?
>
> A.   No.

(Emmet Dep. 29:19-23)   (See also, *Id.* at 30:15-21.)

It is undisputed that at 12:30 a.m. on January 18, 2006, when the first text messages started being sent as part of the Cell campaign, <u>no</u> human pushed a send button to transmit the messages. (Jelley Dep. at 94:8-17)  Instead, earlier, somebody programmed the equipment so that it would be sent automatically at 12:30 a.m.  (*Id.*)

As Mr. Snyder states in his Declaration – and as seems self-evident -- it is not only the custom and practice in the text messaging industry for companies to automate the delivery of bulk text messages such as were sent here, but Defendants simply *could* not have transmitted 60,000 text messages to 60,000 cell phone numbers as they did, in the time and at the rate that they did it, without using autodialing equipment.  (Snyder Dec. ¶ 23)  As mBlox's Jay Emmett testified, the "throttle" or number of messages that clients, such as these Defendants, can send through its system is measured in "messages per **second**."  (Emmet Dep. at 31:11-12)  This couldn't have been done by humans.  It could only be done by an automatic telephone dialing system. And it is that capacity to unleash thousands of messages on the public that is <u>precisely</u> what the TCPA targets.

- 10 -

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

It is similarly uncontroverted that Defendants' equipment "dialed" cell phone numbers. *Joffe v. Acacia Mortg. Corp*., 211 Ariz. 325, 121 P.3d 831 (Ariz.App. Div. 1 2005) *review denied* (May 23, 2006), *cert. denied Acacia Mortg. Corp. v. Joffe*, 127 S.Ct. 934 (Jan 8, 2007). In *Joffe*, Acacia argued[10] that it did not use equipment that "called" or "dialed"[11] Joffe's cellular telephone number, that its computers simply sent e-mail to an e-mail address. *(Id.* at 838*)* The *Joffe* court disagreed, explaining that, "Acacia took advantage of a service offered by Joffe's carrier to reach Joffe's cellular telephone:"

> Acacia took advantage of Internet-to-phone SMS technology -- technology that guaranteed its computer generated text messages would be delivered to Joffe's cellular telephone. **By pairing its computers with SMS technology, Acacia did what the TCPA prohibits**. It used an automatic telephone dialing system to call a telephone number assigned to a cellular telephone. (*Id.* at 839) (emphasis added)

The *Joffe* court reasoned that "Even though Acacia used an attenuated method to dial a cellular telephone number, it nevertheless did so." *(Id.) Joffe* further explained that "Although the technology Acacia used to deliver the SMS messages to Joffe's cellular telephone may not have existed in 1991 when the TCPA was enacted, the wording of the statute is not limited to 1991 technology":

> Congress prohibited calls made using "*any* automatic telephone dialing *system*." (Emphasis added.) Congress described such a system in functional terms: "equipment which has the capacity-(A) to store or produce telephone numbers to be called ... and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). This wording demonstrates Congress anticipated the TCPA would be applied to advances in automatic telephone dialing technology.

*(Id.)* (Italics in original).  Defendants here likewise took advantage of a service offered by Plaintiff's carrier to reach Plaintiff's cell phone. (Emmet Dep. 33:4-8)

---

[10] While Acacia did not "dispute its computers randomly or sequentially produced telephone numbers," it did <u>not</u> "concede" the use of an automatic telephone dialing system, as Defendants suggest in their papers at page 9, n. 6.

[11] "The TCPA does not define the word dial," but as *Joffe* explains, "In the context of the phrase "to dial such numbers" the words "to dial" mean to "operate" or "manipulate" a device "in order" to make or establish a telephone call or connection." *Id.* at 838, n.10.

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The technology employed by Defendants here did *precisely* what the TCPA prohibits:  it stored numbers to be called and later in fact dialed them without human intervention.

**B.  The TCPA Prohibition Applies To These Text Messages**

Despite the fact that the very message they sent says "The next **call** you take could be your last," Defendants now argue the message in fact was <u>not</u> a call within the scope of the TCPA.  (Def. Mem. at 18)  That argument is untenable.  Although the TCPA does not define the word "call," the FCC has been <u>explicit</u> that the TCPA prohibition on ATDSs:

> encompasses both voice calls **and text calls** to wireless numbers including, for example, **short message service (SMS) calls**.

See 2003 Report and Order at 14115 (emphasis added)

Indeed, the FCC has subsequently confirmed -- on more than a few occasions -- that the TCPA "applies to text messages":

> And, as we explained in the NPRM and a previous Commission Order, the **TCPA prohibition on using automatic telephone dialing systems to make calls to wireless phone numbers applies to text messages** (e.g., phone-to-phone SMS), as well as voice calls. We clarify here that this prohibition applies to <u>all</u> autodialed calls made to wireless numbers, including audio and visual services, <u>regardless of the format of the message</u>.

*In the Matter of Rules and Regulations Implementing the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003*; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 19 FCC Rcd. 15927, 2004 WL 1794922 (F.C.C. August 12, 2004) (the "2004 CANSPAM and TCPA Order") (emphasis added);[12] *see also In The Matter Of Rules And Regulations Implementing The Telephone Consumer Protection Act Of 1991*, 19 FCC Rcd. 19215, 19216, 2004 WL 2104233 (F.C.C. September 21, 2004) (Same).[13]

---

[12] "[T]he TCPA and Commission's rules that specifically prohibit using automatic telephone dialing systems to call wireless numbers already apply to <u>any</u> type of call, including <u>both</u> voice <u>and</u> text calls. We also noted in the NPRM that the legislative history of The CAN SPAM Act suggests section 14, in conjunction with the TCPA, was intended to address wireless text messaging." (*Id.*; emphasis added.)

[13] While Defendants ultimately acknowledge – in a footnote – the FCC's ruling that the TCPA "encompasses both voice calls and text calls," they argue without explanation that those decisions are "unreasonable and contrary to the

- 12 -

Not only do the rules and regulations reject Defendants' position, but the case law does as well.  Like Defendants here, the defendants in *Joffe*, argued that text calls lacked the "characteristics of a traditional telephone call" and fell outside the purview of the TCPA.  (*Id.* at 835)  *Joffe* <u>rejected</u> those arguments:

> [A] call subject to § 227(b)(1)(A)(iii) of the TCPA occurs when the caller has made an attempt to communicate by telephone, even if the attempt does not present the potential for a two-way *voice* intercommunication" (*Id.* at 836-37)

*Joffe* explained that a text message call <u>does</u> fall within the ordinary meaning of the word "call," when associated with telephone use:

> Of course, call is also commonly associated with telephone use. In that context, when the word call is used as a verb, one of its most common meanings is to **communicate or try to communicate with by telephone**. E.g., Webster's Third at 318 ("to communicate with or try to get into communication with a person by telephone"). (*Id.* at 835*)* (emphasis added)

*Joffe* concluded that, "In our view, given that the TCPA was designed to regulate the receipt of automated telephone calls, **Congress used the word call to refer to an attempt to communicate by telephone**." (*Id.*), citing *United States v. Amer. Trucking Assoc.*, 310 U.S. 534, 542-43, 60 S.Ct. 1059 (1940) (when words of a statute are susceptible to more than one meaning, courts are to interpret them in a matter which is reasonable given the subject matter of the statute and its purpose).  As *Joffe* explained, "There is no language in the TCPA that restricts calls to only those that present the potential for a <u>voice</u> communication. The TCPA's provisions at issue here apply to <u>any</u> type of call, voice **<u>or text</u>**."  (*Id.* at 836) (emphasis added) ("It is the act of making a call, that is, of attempting to communicate to a cellular telephone number using certain equipment that the TCPA prohibits. Whether the call had the potential for a two-way real time voice communication is irrelevant.").

---

express purpose and language of the statute." (Def. Mem. at 19, fn. 19)  In fact, as demonstrated above, they are completely consistent with the purpose and language of the statute.

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff is not aware of a contrary interpretation of a "call" under the TCPA by any court or regulatory body, nor do Defendants cite to any.   The text calls are plainly within the scope of the TCPA.

## II.   Defendants Are Not Entitled To Summary Judgment On The Basis Of Their Claim That Ms. Satterfield Was Not Charged For Their Unsolicited Text Call.

Defendants next argue that they are entitled to summary judgment because (a) the TCPA prohibits only text spam that results in charges to the recipient, and (b) Ms. Satterfield supposedly incurred no such charges.  Defendants' argument is wrong in both regards.   There is no requirement that a recipient incur charges as a result of receipt of the text message, and, in any event, Ms. Satterfield *did* incur a charge in connection with Defendants' text spam.

### A.   Defendants' Proposed Reading Of The Statute Is Untenable

The beginning point for this discussion is to note that the plain language of the TCPA is clear: <u>all</u> ATDS calls made without the prior express consent of the cellular telephone recipient are forbidden, without regard to whether the recipient incurs a charge for that receipt.  The only exception is if the FCC explicitly exempts the call for some reason.  One need look no farther than the plain words of the statute.  The TCPA provides in relevant part that it is illegal to make any call using an ATDS:

> to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or  other radio common carrier service, or any service for which the called party is charged for the call.

47 U.S.C. § 227 (b)(1)(A)(iii).  Defendants, however, without spelling it out, necessarily argue that the phrase, "for which the called party is charged for the call," applies to all four categories of calls[14] that go before it.  That argument violates every tenet of statutory construction, including the doctrine of the last antecedent and the doctrine of interpreting disjunctives.

---

[14]   The statute prohibits calls to any telephone number assigned to (1) a paging service, (2) cellular telephone service, (3) specialized mobile radio service or other radio common carrier service, or (4) any service for which the called party is charged for the call.

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The "doctrine of last antecedent" teaches that "where one phrase of a statute modifies another, the modifying phrase applies only to the phrase immediately preceding it." *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 832 (9th Cir.1996) ("We have long followed this interpretive principle."), citing Norman J. Singer, Sutherland on Statutory Construction § 47.33 (4th ed. 1985) ("[Q]ualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.")  So, too, with the disjunctive "or" that precedes the phrase, "or any service for which the called party is charged for the call."  As the Court in *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975), observed, "As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately."

These rules would be dispositive without even making reference to 47 U.S.C. § 227(b)(2)(C), which provides:

> The Commission may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect.

If the TCPA applied only to calls for which the recipient was charged, as Defendants contend, there would be no reason to <u>have</u> Section 227(b)(2)(C).  There would be no reason for the FCC to "exempt from the requirements" of the statute calls for which the recipient was not charged if, as Defendants contend, the statute does not even *cover* calls for which the recipient is not charged.  Defendants urge a reading of the statute that simply cannot be squared with the plain words of the statue, settled rules of statutory construction, or the rest of the statute.

Confirming Plaintiff's position, the FCC has consistently ruled that the only calls exempted from the reach of the statute are those sent by cellular carriers to their own subscribers.

Under 47 U.S.C. § 227(b)(2)(C), no-charge calls are subject to the constraints of the TCPA unless the FCC explicitly exempts them.  Relying on a 1992 FCC Report and Order, Defendants seem to argue that the FCC <u>did</u>, in fact, exempt the type of calls in question here.

1  (Def. Mem. at 15:10-20.)   In suggesting this, Defendants ignore conclusive evidence to the

2  contrary.

3          In 1992, the FCC was looking at a relatively narrow issue, *i.e.,* whether calls *made by*

4  *cellular carriers to their own customers* were under the purview of the TCPA.  The FCC

5  concluded that so long as the customers were not charged for those calls, such calls fall outside

6  of the statute.  1992 TCPA Order, 7 FCC Rcd. 8752, 8775, para. 45.  Defendants attempt to use

7  this ruling as a basis to conclude that *all* no-charge calls -- regardless of the identity of the

8  caller -- are exempted from the TCPA.  That is not the case.

9          In 2002 and 2003, the FCC dealt with this issue explicitly.  As it first explained in a 2002

10  notice, its 1992 report was limited to calls made by cellular carriers; it then gave notice and

11  sought comment on whether that ruling should be <u>expanded</u> to include <u>all</u> no charge calls:

12              In the [1992] TCPA Order, the Commission concluded that calls
                made by cellular carriers to their subscribers for which the
13              subscribers were not charged do not fall within the prohibitions on
                autodialers or prerecorded messages. We seek comment on
14              whether there are **other** types of calls to wireless telephone
                numbers that are not charged to the called party, and whether such
15              calls **also** should not fall within the prohibitions on autodialers or
                prerecorded messages.
16  *See,* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,

17  Notice Of Proposed Rulemaking and Memorandum Opinion and Order, CG Docket No. 92-90,

18  par. 45 (2002) (emphasis supplied)  In its 2003 Report, the FCC emphasized the issue:

19              In the 2002 Notice, the Commission noted that the TCPA permits
                the Commission to exempt from the restrictions on autodialer or
20              prerecorded message calls, "calls to a telephone number assigned
                to a cellular telephone service that are not charged to the called
21              party, subject to such conditions as the Commission may prescribe
                as necessary in the interest of the privacy rights [the TCPA] is
22              intended to protect."  In the 1992 TCPA Order, the Commission
                concluded that calls made *by cellular carriers* to their subscribers
23              for which the subscribers were not charged do not fall within the
                prohibitions on autodialers or prerecorded messages.  We sought
24              comment on the extent to which telemarketing to wireless
                consumers exists today and if so, the nature and frequency of such
25              solicitations.  We asked whether there are other types of calls to
                wireless telephone numbers that are not charged to the called party,
26              and whether such calls also should not fall within the prohibitions
                on autodialers or prerecorded messages
27

28
                                    - 16 -
        PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*See*, Rules and Regulations Implementing The Telephone Consumer Protection Act of 1991, CG

Dock. No. 02-278, par. 160 (2003)(2003 Report) (emphasis in original), and was equally clear in

its answer – it decided <u>not</u> to extend the no-charge exemption to other calls:

> We affirm that under the TCPA, it is unlawful to make *any call*
> using an automatic telephone dialing system or an artificial or
> prerecorded message to any wireless telephone number.

*Id.,* par. 165 (emphasis in original).

Defendants simply cannot credibly argue that there is any "charge" requirement in order

to make out a TCPA violation.  However, here it is equally clear that there *were* charges in

connection with the text message in question, as we now discuss.

**B.   Plaintiff Did Incur A Charge For Her Call.**

The  TCPA and the FCC's rules leave no ambiguity.  The "no charge" exemption applies

only to cellular carriers calling their own customers; it does not apply to third-party advertisers

such as Defendants.  And, although Defendants strain to argue that the sole concern behind the

implementation of the TCPA was cost, that is not so.  The FCC has repeatedly explained that the

TCPA is meant to protect consumers' privacy rights, such as, for example, the right not to be

awakened in the middle of the night with a message warning "the next call you take might be

your last."  Nevertheless, this is mooted for two separate reasons.  First, it is nonsense to say that

Ms. Satterfield didn't pay for the receipt of text messages merely because she paid for a plan that

included receipt of an unlimited number of text messages. The quote from the FCC found at page

8, lines 15-18 of Defendants' own brief expressly makes this very point.  Further, separate and

apart from that fact, Ms. Satterfield then undisputedly incurred an *additional* charge in order to

instruct Defendants to no longer send her family threatening messages.  And, as explained in the

TCPA's  legislative history, Congress was troubled by these types of charges no less than

charges for calls received. *See* Senate Report 102-177 (Oct. 8, 1991) ("[U]nsolicited calls placed

to fax machines, and cellular or paging telephone numbers, often impose a cost on the called

party (fax messages require the called party to pay for the paper used, cellular users must pay for

1    each incoming call, *and paging customers must pay to return the call to the person who*

2    *originated the call*.") (Emphasis added)

3    **III.**    **Ms. Satterfield Did Not Consent To Receive Defendants' Message Because Simon & Schuster Is Neither A Nextones Affiliate Nor A Nextones Brand**

4

5        Defendants argue that even if the TCPA applies, they are not liable because Ms.

6    Satterfield supposedly gave her prior express consent to receive the message.  To rule in

7    Defendants' favor, the Court would have to find that Simon & Schuster is an "affiliate" of

8    Nextones solely because Nextones *now* states it is one. [15]  That premise, if accepted, would

9    vitiate the TCPA, result in the complete denial of any privacy protection for consumers, and

10    stand the law regarding corporate affiliation on its head.  There is neither legal authority nor

11    common sense behind Defendants' position.  It is untenable to conclude that by checking a box

12    on the Nextones website agreeing "to receive promotions from Nextones affiliates and brands" in

13    connection with the downloading of a ringtone, Ms. Satterfield – and every other consumer who

14    took advantage of Nextones' offer to provide a free ringtone – consented to receive both

15    telephone and email messages from any company, anywhere in the world, selling any product or

16    service, to whom Nextones chose to sell contact information.

17        **A.**    **There Is No Evidence Of Any Type Of Business Relationship Between Simon & Schuster And Nextones**

18

19        There is no evidence – none -- to support an "affiliate" relationship between Simon &

20    Schuster and Nextones under any reasonable definition of the term.  An affiliate is "an affiliated

21    person or organization, specifically, a business entity effectively controlling or controlled by

22    another or associated with others under common ownership or control."  (Merriam-Webster's

23    Dictionary of Law © 2001, available at http://research.lawyers.com/glossary/affiliate.html,

24    Exhibit 1(M))  Defendants concede that "Nextones shares no corporate structure with the

25    Defendants and is not a corporate 'affiliate' in a strict legal sense."  (Def. Mem. at 20.)

26

27    [15]  "Affiliate" and "brand" are terms chosen by Nextones; they are not used or defined in the TCPA.  On its website, Nextones listed three "Partners:" Edge Wireless, International Student and Mailworkz.  Exhibit 1 (R).

28

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Even adopting Defendants' proposed, "non-legal" definition of affiliate as one having a "close association" with another, here there is no evidence of <u>any</u> relationship between them -- neither Simon & Schuster nor Ipsh has ever had *any* type of business relationship, not even a licensing relationship, with Nextones.  Simon & Schuster contracted with Ipsh, which in turn contracted with MIA, which purchased Ms. Satterfield's telephone number and personal information from Nextones.  Defendants have not come forward with any evidence to support their requested finding that there is any "close association," much less an affiliate relationship, between Defendants and Nextones.  The argument fails utterly.

**B.** **The Nextones Registration Form Is Legally Insufficient To Constitute <u>Consent To Receive Text Messages From Unrelated Third Parties</u>**

Ms. Satterfield did not, as Defendants contend, "register her son's phone to receive promotional text messages."  What she did was to sign up to receive a "free" ringtone from a company who represented (1) that its business was selling ringtones and other features to "customize" your phone, and (2) that it would <u>not</u> sell customer information to third parties.  As a matter of law, Ms. Satterfield's acceptance of the Nextones ringtone does not constitute consent to receive unsolicited text messages from unrelated third parties, such as here.

At the time Ms. Satterfield logged on to it, Nextones' website, www.Nextones.com (Exhibits 1(N)-(R)), described the company as a seller of ringtones and phone games, offering "everything you need to customize your cell phone."  The public was invited to sample Nextones' products by downloading a ringtone advertised as "free."  The consumer was asked to fill in an online registration form and to check a box agreeing "to receive promotions from Nextones affiliates and brands" and advised that if the consumer failed to check the box, she "may *not* be eligible for our FREE content."  The web page did *not* state that Nextones promotions would be sent to the consumer's mobile phone (as opposed to by email); it did not define "affiliate" or "brand;" and it did not state that the consumer would receive text messages about unrelated products having <u>nothing</u> to do with the "customizing of your cell phone."  Moreover, the text message that Ms. Satterfield received did not identify <u>Cell</u> as a product or

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   "brand" of Nextones; it stated merely, "Pwd by Nexton," a phrase which none of the witnesses

2   has yet been able to explain and which is without any readily apparent meaning.

3        On another page of the Nextones website, "About Nextones.com," (Exhibit 1(Q))

4   Nextones described its affiliates as other companies who "sell mobile content such as ringtones

5   and graphics."  Its "Privacy Policy" (Exhibit 1(P)) expressly stated that Nextones *will not sell its*

6   *customer information to third parties:*

7         Nextones.com respects the privacy of the users of this Internet site and general
          personal electronic communication via the Internet.  Absent your prior consent,
8         Nextones.com does not share your e-mail address or other personal profile
          information, such as name, address, gender, age or mobile phone number with any
9         third parties.

10   Under no reasonable construction of this language can a consumer who registered to receive a

11   free ringtone be said to have consented to receive telephone messages from unrelated third

12   parties whose products, like Simon & Schuster's, have nothing to do with "customizing your

13   phone."  Defendants' argument is untenable.  It is incapable of limitation or accountability.  It is

14   certainly inadequate to entitle Defendants to summary judgment.

15        **C.    Defendants' Argument Contradicts All Applicable Industry And**
                **Regulatory Standards, Which Make Clear That The Sale And Resale**
16              **Of A Customer List Cannot Create An Affiliate Relationship**

17        FCC regulations, applicable industry guidelines, and the requirements of the major

18   wireless carriers all state that a consumer's consent to receive mobile marketing messages is

19   limited to the *specific product or campaign* in connection with which the consent was obtained

20   and may not be sold to others.

21        **The FCC Regulations.**  Although the FCC has not defined the term "consent" as used in

22   §227(b)(1)(A)(iii), it has addressed the meaning of the term "affiliate" in the context of

23   regulating facsimile transmissions and telephone solicitations, which may be sent only by entities

24   who have an "established business relationship" (EBR) with a consumer.  *See* 47 U.S.C.

25   §§227(b)(1)(C)(i), 227(a)(2).  The Commission found that,

26         consistent with the FTC's amended Rule, affiliates fall within the established
           business relationship exemption **only if the consumer would reasonably expect**
27         **them to be included** given the nature and type of goods or services offered and
           the identity of the affiliate.

28                                        - 20 -

*Rules and Regulations Implementing the TCPA, Report and Order*, 18 F.C.C. Red. 14014 *et seq.*, 2003 WL 21517853, at 14082-83; *see* 64 CFR §64.1200(d)(5).  The Commission explicitly rejected the industry's position, "that a consumer's EBR with a third party telemarketer, including a retail store or independent dealer, extends to a seller simply because the seller has a contractual relationship with that telemarketer," instead ruling that "[t]he seller would only be entitled to call a consumer under the EBR exemption based on its <u>own</u> EBR with a consumer." 18 F.C.C.R. 14083; emphasis added. Simon & Schuster's and ipsh's argument runs directly counter to the FCC's regulations.

**The MMA Guidelines.**  The Mobile Marketing Association, or MMA, is a consortium of industry representatives including advertisers, wireless carriers, aggregators such as mBlox, and others.  Ipsh is a member of the MMA.  (Jelley Dep. at 11:11-15.)  The MMA has adopted a "Code of Conduct" applicable to content providers, carriers, technology providers, advertisers, and brands.  *See* http://mmaglobal.com/modules/content/index.php?id=5 (Exhibit 1(S) hereto). The Code is divided into six categories:  choice, control, customization, consideration, constraint and confidentiality.  *Id.*  Under "Choice," the Code states:

> Consumers must opt-in to all mobile messaging programs.  Consumers may opt-in to a program by sending a text message, calling a voice response unit, registering on a website, or through some other legitimate paper-based method; they opt-in for a specific program only.  *Choice doesn't carry forward unless the consumer is part of a brand loyalty program whose opt-in registration clearly provides for on-going communications.*  Even then, the consumer's desire to participate must be validated at the beginning of a new messaging program. [emphasis added]

The MMA's "Best Practices Guidelines" (Exhibit 1(T)) implement the MMA Code of Conduct. The Guidelines provide, *inter alia,*

> **Subscriber approvals pertain <u>only</u> to the specific program the consumer has subscribed to and should not be used to promote other programs, products, or services, or to otherwise send information of any kind that is unrelated to that specific program unless the subscriber has opted in to receive this information.**

http://www.mmaglobal.com/bestpractices.pdf at 2.: emphasis added.  The Best Practices also specifically state that selling opt-in lists is prohibited.  *Id*. at 8.

- 21 -

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    The Master Services Agreement between mBlox and Ipsh obligated Ipsh to comply with

2  "all regulations, directions, codes of practice and other rules and guidelines, mandatory or

3  otherwise," promulgated by the MMA (Exhibit 1(I) at Dep. Ex.5, at MBLOX 000065), and

4  Defendants admit that the MMA Guidelines are applicable to their conduct in this case.  (Def.

5  Mem. at 4:12-15.)  Defendants clearly violated the MMA opt-in policy,[16] and they are liable for

6  violating the TCPA regardless of whether Nextones also committed such violations.

7    **The Wireless Carrier Requirements.**  Defendants also failed to comply with the

8  applicable requirements of the wireless carriers.  In fact, Defendants' violation of T-mobile's

9  requirements led to the early termination of the campaign, so that only 60,000 – out of the

10  planned and paid-for 100,000 – messages were in fact sent.  (*See* Emmet Dep. at 65:20-67:3 and

11  Ex. 8 thereto; Jelley Dep. 60: 10-18).

12    As mBlox's Jay Emmet explained, in general, before commencing an SMS campaign, the

13  sender is required to submit a "campaign brief" describing the details of the campaign, including

14  the specific text proposed to be sent and evidence that the targeted consumers have in fact

15  consented to receive the message.  (Emmet Dep. 58:16-69:14, 59:18-60:9; *see* Exhibit 1(I) at

16  Dep. Ex. 9 [discussed below], at MBLOX000362.)  The campaign briefs must be submitted 4-6

17  weeks in advance of the campaign, to give the carriers time to review and approve or disapprove

18  them.  (*See* mBlox Products, Exhibit 1(I) at Dep. Ex. 7, at MBLOX 0000025.)   The Cell

19  campaign violated these rules from the outset, however, because ipsh! failed to forward a

20  campaign brief to mBlox for its submission to the carriers.  (Emmet Dep. at 61:19-62:13.)

21    The carrier requirements are reproduced in mBlox's customer guidelines, titled

22  "Frequently Asked Questions – Carrier Campaign Requirements" (the "FAQs"), which are

23  distributed by mBlox to each of its clients including, in this case, Ipsh.  The FAQs[17] echo the

24  MMA and FCC prohibition against using a consumer's agreement to receive one type of

---

[16] Mr. Jelley himself characterized MIA as a "vendor of third party opt-in lists."  (Jelley Dep. at 15:6-9.); see also IPSH 000870; Exhibit 1(U) ("SMS blast from third party opt-in list of 100,000 users").

[17] The references herein are to the 2006 FAQs, Version 060115, Exhibit 1(I).  Although subtitled "Premium SMS," the FAQs apply to nonpremium messages of the type involved in the Cell campaign.  Emmet Dep. at 80:20-81:8.

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

message (or one SMS service) as the basis to send SMS messages concerning unrelated products. For example, T-mobile states that a subscriber's request for a mobile communication "cannot be used as a blanket opt-in to receive additional messages outside the context of the specific program they are opting in to."  (MBLOX 000397, section 4.7.27.)   Nextel and Cingular both warn that, **"Opt-in is on a per-Campaign basis.**  Additional messages may **not** be delivered to the subscriber upon completion of the applicable campaign.  Subsequent campaigns will require subscribers to provide opt-in registration specifically for the subsequent campaign."  (MBLOX 000381, section 4.5.16; MBLOX 000365, section 4.3.10.2; emphasis added.)

Ipsh could not have been unaware from all of the above rules and regulations that Ms. Satterfield's request to receive a free ringtone from Nextones did not constitute consent to receive text messages from unrelated brands and businesses such as Simon & Schuster.

**IV.   Plaintiff Is Not Equitably Barred From Bringing This Action**

Defendants argue that Ms. Satterfield "misrepresented her son's personal information" and has "unclean hands."  They surmise that "had Plaintiff provided truthful information to the ringtone provider, her son would not have received the text message and this lawsuit never would have happened."  (Def. Mem. at 1.)  In other words, they would have spammed someone else.   Ms. Satterfield did not mislead Defendants about any pertinent facts, and all of the equities are in her favor.

**A.   This Case Has Nothing To Do With The Rights Of Minors**

First, the fact that Ms. Satterfield's phone was answered by her son, who was (and still is) a minor, is irrelevant.  The TCPA does not set one standard for children and another for adults. While Ms. Satterfield reacted strongly to the message in part because it upset her son, she does not seek damages for the emotional distress suffered by either of them, but only the statutory penalty which the legislature has determined is appropriate for violations of the TCPA. This case is not about spamming minors.  It is about illegal spam, period.

**B.   The Doctrine Of Unclean Hands Is Inapplicable Because Plaintiff Seeks Statutory Penalties For Violation Of A Public Policy**

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Second, while Ms. Satterfield strongly disputes that her conduct here was anything but appropriate, the Court need not reach that question because "[t]he maxim 'he who comes into equity must come with clean hands' should not be invoked when the act sought to be enjoined is against public policy." *Jomicra, Inc. v. California Mobile Home Dealers Ass'n* (1970) 12 Cal.App.3d 396, 402. *See also Waters v. San Dimas Ready Mix Concrete* (1963) 222 Cal.App.2d 380, 382-83 (plaintiff's alleged unclean hands irrelevant to his action for past due wages and statutory penalties). Like the statutes at issue in those cases, the TCPA was enacted to promote the constitutionally-protected right of privacy, which would not be served by a judgment barring Ms. Satterfield from enforcing the Act.

Also missing from this case is the requisite preexisting relationship between the plaintiff and defendants necessary to support any equitable defense. As explained in *Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728-729:

> [I]t is not <u>every</u> wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, *i.e.*, it must pertain to the very subject matter involved and *affect the equitable relations between the litigants*. Accordingly, relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court. [emphasis added]

Here, and in marked contrast to the cases cited by Defendants (Def. Mem. at 23-24), Ms. Satterfield had *no* preexisting relationship or communications with either Simon & Schuster or Ipsh, and she did not want the text message they sent her. Under these circumstances, the doctrine of unclean hands is inapplicable and certainly insufficient to bar Plaintiff's claims.

## C.    Ms. Satterfield Did Not Engage In Inequitable Conduct

Finally, should the Court nevertheless decide to consider the issue, there is no factual basis for Defendants' contention that Ms. Satterfield misled them to their detriment. It is precisely because Ms. Satterfield fit into the age demographic at whom the Cell campaign was directed– and because she accurately provided that information to Nextones – that Defendants targeted her telephone number. Plaintiff was particularly concerned about security issues and

had given her young son strict instructions that he was never to enter any personal information onto the Internet; if he wanted to download anything, he needed to "go through" her.  (Satterfield Dep. 53:12-16, 62:9-63:4, 79:19-80:13.)  When Ms. Satterfield's son asked if he could have a new ringtone for his phone, she agreed to download it for him.   The Nextones online form did *not* inquire whether the Nextones "registered user" was the primary user of the phone, and can most reasonably be interpreted as applying to the holder of the wireless account, which was Ms. Satterfield.  The age and gender information she entered – the only information potentially relevant to this case – was true and correct.  (Satterfield Dep. at 51:23-52:1, 54:24-55:3.)  Defendants can hardly complain that an individual in their targeted demographic in fact received and read their advertisement.  And because Ms. Satterfield read the message, Defendants did not suffer even the minimal "detriment" – the loss of the fraction of a cent it cost them to send the SMS message to the phone used by Ms. Satterfield's son – that they claim.

The concerns which Ms. Satterfield had about divulging personal information about her son on the Internet are borne out by this lawsuit.  To the extent that the equities are relevant, it is Nextones' misrepresentation about its business and Defendants' failure to take even the most rudimentary steps to ensure that the targets of their SMS campaign had in fact consented to receive such advertisements, that should determine the Court's decision in this case.

## CONCLUSION

For the foregoing reasons, Defendants' Motion For Summary Judgment should be denied.

Dated:  May 1, 2007                        Respectfully submitted,


                                           CHAVEZ & GERTLER, LLP
                                           THE JACOBS LAW FIRM, CHTD.
                                           BLIM & EDELSON, LLC

                                           By:   /s/ John G. Jacobs
                                           John G. Jacobs, One of the
                                           Attorneys for Plaintiff
                                           Laci Satterfield

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2007, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of California, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this notice as service of this document by electronic means:

James K. Lynch, Esq.
Melanie E. Griswold, Esq.
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94941

Peter L. Winik , Esq.
Justin R. Rhoades, Esq.
Jennifer C. Archie, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004

_____/s/ John G. Jacobs_____
John G. Jacobs

PLAINTIFF'S OPPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT