IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LACI SATTERFIELD, Individually, and on behalf of others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>SIMON & SCHUSTER, a New York Corporation; IPSH!NET, INC., a Delaware Corporation d/b/a IPSH!<br><br>    Defendants.<br>_____/ | No. C 06-2893 CW<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

    Defendants Simon & Schuster, Inc. and ipsh!net, Inc. d/b/a ipsh! move for summary judgment.  Plaintiff Laci Satterfield opposes this motion.  The matter was heard on June 7, 2007.  Having considered all of the papers filed by the parties, the evidence cited therein and oral argument, the Court grants Defendants' motion.

BACKGROUND

    Plaintiff has two cellular, or mobile, telephones, one of which is used by her minor son.  In December, 2004, at her son's

request, Plaintiff visited www.nextones.com (Nextones) to download a free ringtone for the mobile telephone used by her son, who was then six or seven years old. Before receiving the free ringtone, Plaintiff had to sign up to become a Nextones Member. She typed in her son's initials in the space for "First name" and the first three letters of her son's last name in the space for "Last name," but she provided her email address, her gender and her age. She checked an empty box, next to which were the word: "Yes! I would like to receive promotions from Nextones affiliates and brands. Please note, that by declining you may not be eligible for our FREE content."[1] She then clicked the "Submit" button; above the button appeared, "By clicking Submit, you accept that you have read and agreed to the Terms and Conditions." Nextones' terms and conditions state that Nextones and its affiliates may use a user's mobile phone number in connection with any text message offering or other campaign. According to its privacy policy, Nextones maintains a strict "no-spam" policy and, absent prior consent, does not share personal profile information, including mobile phone numbers, with any third party.

A little over a year after Plaintiff subscribed to Nextones, on January 18, 2006, at half past midnight, Plaintiff's son

---

[1] According to Nextones' Chief Operating Officer, Nextones intended the phrase "Nextones affiliates and brands" to include companies to whom it licensed subscriber information for the purpose of sending the subscriber promotional materials based on the demographic information subscribers provided on the registration page. "About Nextones.com," which was available on Nextones' web page when Plaintiff became a subscriber, however, suggests that affiliates are those interested in selling mobile ringtones and graphics.

2

received a SMS message[2] on the cellular telephone he used.  The message stated:

> The next call you take may be your last... Join the Stephen King VIP Mobile Club at www.cellthebook.com. RplySTOP2OptOut. PwdByNexton.[3]

The message contained only text, and no sound.  The message frightened Plaintiff's son, and he showed it to Plaintiff, who assured him she would take care of it.  Plaintiff replied, "STOP." Although Plaintiff's cellular telephone plan does not charge her for incoming text messages, she is charged for outgoing text messages.  Thus, she did not have to pay for the promotional text message, but she did have to pay for the "STOP" text message she sent in response.

    The text message was sent as part of Defendant Simon & Schuster's promotional campaign for <u>Cell</u>, a Stephen King novel. Defendant Simon & Schuster outsourced the promotional campaign to Defendant ipsh!, a mobile marketing firm, and instructed Defendant ipsh! that the promotional text should be sent to adults ages eighteen to fifty who had opted in to receive advertising on their mobile devices.  Defendant ipsh! then obtained a list of 100,000

---

[2] As explained in <u>Joffe v. Acacia Mortgage Corp.</u>, 211 Ariz. 325, 331 (2005), "SMS is a messaging system that allows cellular telephone subscribers to send and receive short messages (hence, the name) usually limited to 160 or so characters on their cellular telephones."  A SMS message is commonly called a text message. When receiving a text message, the recipient of the message can perform other functions using her mobile device, such as talking on the cell phone or composing a different text message.

[3] According to Defendants, "PwdbyNexton" means powered by Nextones.  Defendant ipsh! required that this be included in the promotional text message to brand the message as coming from Nextones.

individuals who fit the targeted demographic profile from Mobile Interactive Agency (MIA), which had contracted with various website operators, including Nextones.[4] MIA was Nextones' exclusive agent in licensing Nextones' subscriber data for use in text message promotional campaigns. According to Defendants, Nextones would collect consent to receive promotional material on users' mobile devices, and MIA, in turn, would use the data in accordance with the Mobile Marketing Association Guidelines. Defendants contend that the agreements between Defendant ipsh! and MIA, and MIA and Nextones, permitted Defendant ipsh! to send a text message advertising the Stephen King novel to the wireless telephone numbers of individual Nextones subscribers, such as Plaintiff.

The process for sending the promotional text was as follows: MIA provided Defendant ipsh! with electronic plain text or Excel files containing the list of 100,000 mobile numbers of Nextones subscribers; the list came in a series of emails, broken up by the age of the intended recipients. The emails were forwarded to a programmer who then imported the list into a database, which was set up specifically for the Stephen King campaign and which was located on Defendant ipsh!'s server. Defendant ipsh!'s employees entered the relevant information for the promotional messages, including the text of the messages and the time they were to be sent, and packed the messages in "XML" format; the XML messages

---

[4] MIA also licensed lists from a website known as Zingy, where the check box through which people gave their consent to receive promotions was pre-checked. The Cell campaign used a list populated solely with Nextones subscribers. Nextones does not have a pre-checked consent box.

were stored on Defendant ipsh!'s server until they were programmed to be sent to the intended recipients.

The text messages promoting <u>Cell</u> were intended to go out at 12:30 p.m.  Before the intended receiver could receive the message, however, Defendant ipsh!'s program had to send the XML message, or file, to mBlox, Inc., an "aggregator," or mobile transaction networking services company.  mBlox handled the actual transmission of the text messages to the wireless carriers; unlike Defendant ipsh!'s computers, mBlox's computers have the ability to determine to which telephone carriers to send each set of data and then send it to the appropriate carrier.  Defendant ipsh!'s employee mistakenly set the program to begin automatically to send the XML messages at 12:30 a.m.  Defendant ipsh!'s program sent 20,000 XML messages over the Internet, at a rate of 8,000 messages an hour, before the error was discovered.  An additional 40,000 messages were sent to mBlox after 12:30 p.m., as originally planned, and then sent to the intended recipients.  The remaining 40,000 messages, however, were not sent to the intended Nextones subscribers.  After receiving complaints from customers about the promotional text message, T-Mobile notified mBlox, who then refused to send out any more messages on Defendants' behalf.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986);

5

Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Id.

6

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

## DISCUSSION

Congress enacted the Telephone Consumer Protection Act (TCPA) in response to various telemarketing practices arising out of the use of "autodialers" to generate millions of automated telephone

7

calls. <u>Jaffe</u>, 211 Ariz. at 328 (citing S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71)).  As relevant here, the TCPA prohibits any call using any automatic dialing telephone system to any telephone number assigned to a cellular service.  47 U.S.C. § 227.  Specifically, section 227(b)(1)A)(iii) makes it unlawful for any person within the United States "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

    Plaintiff contends that Defendants' actions described above constitute a textbook violation of the TCPA.  According to Defendants, however, summary judgment should be granted in their favor because the text message at issue was not sent using an automatic telephone dialing system, nor is it a "call" within the meaning of the TCPA.  They further argue that they are entitled to summary judgment because Plaintiff was not charged for the text message, because she consented to receiving such promotional messages and because Plaintiff is barred from recovering damages under the doctrines of estoppel and unclean hands.

I.   "Automatic telephone dialing system"

    The TCPA defines an automatic telephone dialing system as "equipment which has the capacity -- (A) to store or produce

8

telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

Defendants contend that the undisputed facts show that the hardware and software used to send the promotional text messages do not fall within this definition because they are not equipment that stores, produces or calls numbers "using a random or sequential number generator." Id. Rather, the equipment at issue sent messages to a specific, finite, non-random and non-sequential list of numbers belonging to Nextones subscribers. Plaintiff concedes that the equipment at issue does not contain or use a random or sequential number generator. Nonetheless, she contends that the equipment Defendants used is an automatic telephone dialing system because it has the capacity to store numbers to be called and to dial numbers without human intervention, automatically making calls to thousands of numbers in a short period of time.

Neither side provides a case on point. And the Federal Communications Commission (FCC), the agency Congress gave authority to prescribe regulations to implement the TCPA, has adopted, verbatim, the TCPA's definition of automatic telephone dialing systems, without providing further definition. See 47 C.F.R. § 64.1200(f). According to Defendants, there are no published opinions construing the "automatic telephone dialing system" portion of the TCPA; this is a case of first impression.

The parties' dispute centers on the phrase "using a random or sequential number generator." Defendants argue that the phrase modifies both "to store" and to "produce telephone numbers to be

9

called."  They point out that where, as here, there is a comma prior to a qualifying clause, that clause should be interpreted to modify all antecedents, not just the last one.  See <u>United States v. Moore</u>, 288 F. Supp. 2d 955, 959 (E.D. Wis. 2003) (quoting 2A Norman J. Singer, Statutes and Statutory Construction § 47:33 at 373 (6th ed. 2000) ("Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.")).  In further support of their argument, Defendants point to the FCC's conclusion that the "prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion."  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8776 (1992) (1992 FCC Report).

    According to Plaintiff, however, the phrase "using a random or sequential number generator" modifies only the last antecedent "produce telephone numbers to be called," not "to store."  Her argument is not persuasive.  Her interpretation is ungrammatical.  To interpret the statute as Plaintiff proposes results in the statute defining an automatic telephone dialing system as equipment that has the capacity "to store. . . and to dial such numbers," without any referent to the numbers stored and dialed.

10

Plaintiff's reliance on recent FCC guidance is also misplaced. In 2003, the FCC considered whether predictive dialers,[5] that use telephone numbers from a list that is not randomly or sequently generated, are automatic telephone dialing systems. The FCC explained,

> The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "<u>capacity</u> to store or produce telephone numbers (emphasis added)...." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies . . . . As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed -- the capacity to dial numbers without human intervention.

In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14091-92 (footnotes omitted) (2003) (2003 FCC Report).

It then concluded,

> Therefore, to exclude from these restrictions equipment that use [sic] predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result . . . . We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.

---

[5] A predictive dialer is dialing equipment that, through the use of complex formulae, attempts to predict when a person will answer the telephone; a telemarketing call is then not transferred to a live operator until the equipment predicts a person will have answered.

11

Id. at 14092-93 (footnotes omitted).

As Defendants point out, although the FCC rejected the argument that predictive dialers were not automatic telephone dialing equipment merely because they used a list of numbers, it did not find that any program using a list of numbers is an automatic telephone dialing system, especially when that list was generated based on people who had agreed to receive promotions. Further, the FCC language that Plaintiff quotes is merely commentary, not a regulation, and, thus, not entitled to Chevron deference.  See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-45 (1984) (ensuing regulations are binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute).

The Court concludes that the plain language of the statute does not allow the Court to divorce "to store" from the "random or sequential number generator," as Plaintiff suggests.  Rather, the phrase "random or sequential number generator" modifies "store," "produce" and "called."  Because it is undisputed that the equipment here does not store, produce or call randomly or sequentially generated telephone numbers, the Court grants summary judgment in Defendants' favor: the equipment at issue is not an automatic telephone dialing system under the TCPA.

II.  "Prior express consent of the called party"

The TCPA prohibits only calls made without the "prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A). Defendants argue that summary judgment is warranted because

12

Plaintiff consented to receive promotional messages, including the message at issue. Defendants note that, to receive the free ring tone for the cellular telephone used by her son, Plaintiff agreed to receive promotions from "Nextones affiliates and brands." Defendants concede that Nextones' website did not define "brands" and that it suggested that "affiliates" are those interested in selling mobile ringtones and graphics. Defendants point to no case defining "affiliates" or "brands" as those terms relate to the TCPA. Nonetheless, they claim that Plaintiff's causes of action under the TCPA fail as a matter of law because the text message at issue was identified as carrying the Nextones brand in that it stated that it was "PwdbyNexton," i.e., powered by Nextones, and because Defendant ipsh! and MIA were Nextones affiliates.

    Plaintiff disagrees and argues that, although she consented to receive promotional messages from Nextones affiliates and brands, she did not consent to receive the text message at issue. She notes that Nextones' privacy policy statement provides that it will not share customer information, including mobile phone numbers, with any third party without consent. According to Plaintiff, Defendants Simon & Schuster and ipsh! are third parties. She further argues that phrase "PwdbyNexton" did not identify the Stephen King text message as a Nextones "brand."

    That argument, however, is contradicted by the facts in this case. "PwdbyNexton" branded the text message as coming from Nextones; it identified the message with a Nextones brand. Thus, while there may be a dispute of fact concerning whether Defendants are Nextones affiliates, there is no dispute of fact that the

13

promotional text message at issue was identified with a Nextones brand.  Plaintiff expressly consented to receive promotions of Nextones brands and, therefore, summary judgment is properly granted on this ground as well.

## CONCLUSION

Because the Court concludes that the equipment at issue is not an automatic telephone dialing system and that Plaintiff consented to receive the promotional text message, the Court need not address Defendants' remaining arguments.  Defendants' Motion for Summary Judgment (Docket No. 60) is GRANTED.  Judgment shall enter accordingly.  Plaintiff shall pay Defendants' costs.

IT IS SO ORDERED.

Dated: 6/26/07

_____
CLAUDIA WILKEN
United States District Judge

14